UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

Billy Ray Hall, as personal representative of The Estate of Valerie Magnan,

Plaintiff,

v.

Southern Health Partners, Inc., Aaron Christopher Welsh, Kimberly James, Petrina Wiley, Franshon Miller, Audrey Evans, Patricia Ann Dukes, Shelvia Gaymon, Tywanna Jenkins, Wheeler Sweat, II, Cynthia Kelley, Regina Dickey, Jeremy Keith Shirley, Marc Meier, Michael McCauley, Lhoman Claude Mays, III, Misty Lee, Tripp Mays, Antonio Artis, Jarret Logan, Terri Woods, Tonie R. Abraham, Carissa Churchill, Barbara Erlewine, Elizabeth Morris, Karen Troublefield, and Helene Sattele,

Defendants.

Civil Action No. 1:21-cv-01251-BHH-SVH

**COMPLAINT**
**(Jury Trial Demanded)**

The Plaintiff above-named, complaining of the Defendants above named, alleges as follows:

PRELIMINARY STATEMENT OF FACTS

1. Plaintiff, Billy Ray Hall, as personal representative of the Estate of Valerie Magnan, is a citizen and resident of Clarendon County, South Carolina. Valerie Magnan was, at all relevant times, a pretrial detainee at the Sumter-Lee Regional Detention Center ("the jail") in Sumter County, South Carolina.

2. Defendants Aaron Christopher Welsh, Kimberly James, Petrina Wiley, Franshon Miller, Audrey Evans, Patricia Ann Dukes, Shelvia Gaymon, Tywanna Jenkins, Wheeler Sweat,

II, Cynthia Kelley, Regina Dickey, Jeremy Keith Shirley, Marc Meier, Michael McCauley, Lhoman Claude Mays, III, Misty Lee, Tripp Mays, Antonio Artis, Jarret Logan, sued in their individual capacities, are citizens and residents of the State of South Carolina and were at relevant times employed by the Sumter County Sheriff's Office ("SCSO") and were acting in the course and scope of his employment, and under the color of state law. These defendants are collectively referred to herein as jail staff.

3. Defendant Southern Health Partners, ("SHP"), contracted with SCSO to perform essential state functions with regard to the jail system and as to the Decedent, and at all relevant times, was responsible for ensuring that the Decedent was safe and receiving adequate care and treatment in accordance with applicable legal standards. The rights violations at issue in this case were carried out by SHP final policymakers, and established SHP policies and practices were a driving force behind the rights violations at issue in this case. These defendants are collectively referred to herein as jail medical staff.

4. Defendants Terri Woods, Tonie R. Abraham, Carissa Churchill, Barbara Erlewine, Elizabeth Morris, Karen Troublefield, and Helene Sattele were individuals who at all times relevant hereto, were employed by SHP and they will be sued in their individual and official capacities. At all relevant times, Defendants Terri Woods, Tonie R. Abraham, Carissa Churchill, Barbara Erlewine, Elizabeth Morris, Karen Troublefield, and Helene Sattele were acting in the course and scope of their employment, and under the color of state law.

NATURE OF ACTION

5. This is an action against aforementioned Defendants for compensatory damages, punitive damages, attorneys fees, costs and all other available damages proximately cause by the

Defendants' deliberate indifference of and violations of the Plaintiff's decedent's clearly established constitutional rights.

## JURISDICTION

6. This action is brought pursuant to 28 U.S.C. § 1331 and § 1343(a)(3). The substantive claims herein arise under 42 U.S.C. § 1983, violations of civil rights, and the Eighth and Fourteenth Amendments to the United States Constitution.

## FACTUAL HISTORY AND TIMELINE

7. Prior to the events in question, the jail had a well-documented history of failing to provide necessary medical treatment to prisoners in the jail, failing to select qualified contractors to perform medical services in the jail, and otherwise violating the rights of inmates.

8. Accordingly, the jail was well-aware of the need to vet medical contractors thoroughly, to monitor the activities of medical contractors at the jail, and to train nonmedical employees regarding recognition of and proper response to obvious medical needs.

9. The Decedent was arrested during a routine traffic stop in which she was driving a stolen car and in possession of drug paraphernalia. Notwithstanding, the arresting officer, Jeremy Keith Shirley failed to properly search her and monitor her condition and to ensure that she did not attempt to ingest any drugs as is common of suspects in this situation, and we now know that she ingested a lethal dose of drugs while in Shirley's custody and care. She was booked into the jail on April 29, 2018 by Defendant Shirley. The jail was aware during the initial intake that the Decedent displayed signs of substance use, and that she was exhibiting symptoms consistent with a drug overdose.

10. Although the Decedent gave the arresting officer drug paraphernalia, no record exists that the Decedent was searched then or during intake at the jail. In fact, the arresting officer

stated he could not search the Decedent for unexplained reasons. None of the other deputies or jail employees searched her or kept constant surveillance on her to ensure that she did not have more drugs on her person. The Decedent swallowed at least one plastic bag while in the police car, as mentioned in the coroner's report. The Decedent was booked at 16:20, and then upon her request, she was allowed to use the restroom.

11. Upon arrival at the jail, Defendant Dukes noticed that the Decedent began shaking uncontrollably and that she was exhibiting obvious signs and symptoms that she was experiencing a life-threatening medical emergency. Defendant Gaymon went to medical and informed Defendant Churchill that Decedent needed to be seen by the nurse. Defendant Churchill explained that she was unaware of the nurse's location. Defendant Churchill further explained that she performed the intake, that the Decedent was "detoxing," and that there was nothing they could do for the Decedent instead of immediately transporting the decedent to the hospital or calling 911. Defendant James instructed Defendant Sweat to call medical instead of immediately transporting the decedent to the hospital or calling 911. Defendant Woods, Abraham, and Churchill were called to evaluate the Decedent. Defendant Woods determined that all they could do was place the Decedent on a medical watch instead of immediately transporting the decedent to the hospital or calling 911. Defendant James advised Defendant Duke and Gaymon to put the Decedent back in the cell instead of immediately transporting the decedent to the hospital or calling 911. The Decedent was returned to her cell and laid on her right side at approximately 17:54. At 18:56, the Decedent was found lying on her stomach unresponsive by Defendant James and Miller. CPR was started by Defendant Woods and Abraham, with Defendant James in rotation. Defendant Jenkins called EMS. EMS transported the Decedent to the hospital. Although Narcan and epinephrine

were administered and cardioversion attempted, the Decedent was pronounced dead approximately four minutes after arrival.

12. The Decedent's obvious symptoms of drug toxicity were noted by correctional and medical staff. She was not seen by a doctor and did not receive a professional opinion despite the obvious, acute, and life-threatening nature of her condition. A physician was not on duty at the jail at the time, and nurses and medical technicians are not allowed to diagnose acute emergency drug-related conditions and manage the care of such a patient without the assistance and oversight of a physician. They knew this but did it anyway. The Decedent should have been transported to the emergency room at the first sign of distress. In addition to breaching the standard of adequate medical care, the jail breached the Eighth Amendment and Fourteenth Amendment to the United States Constitution by refusing to take the Decedent to a hospital after she displayed obvious signs of an emergency drug overdose, constituting cruel and unusual punishment. The jail employees and jail medical staff identified herein also did not follow their own protocol or procedures for handling drug toxicity and withdrawal. As a matter of official policy, SHP allows such violations of SHP policy in order to save costs and derive more profit.

13. Despite the Decedent's obvious deteriorating and serious medical condition and a correctional officer asking for a medical assessment, appropriate action was not taken by jail medical staff to provide the Decedent with adequate medical care. The indifference displayed by the jail medical staff to the Decedent's incredibly ill state further delayed adequate medical care and treatment until her condition had severely deteriorated, creating an eventual fatal medical condition.

14. Four minutes after arrival at Prisma Health Toumey emergency department, the Decedent was pronounced dead from methamphetamine drug intoxication. Among her stomach contents on autopsy were four plastic bags, two with white crystalline material, two empty.

15. While the jail defendants contracted with SHP to provide medical services at this time, the Defendant still had a nondelegable duty to provide necessary medical treatment at the jail, and to ensure that nonmedical staff were properly trained to deal with medical emergencies. Officers were trained and expected to identify emergency medical conditions such as the decedent's and immediately transport the patient to the hospital or calling 911, but the jail staff in this case was deliberately indifferent to this and failed to provide her with the necessary medical care that any layperson would have known needed to be provided.

16. Final policymakers at SHP made various policy decisions that led to the Plaintiff's decedent's constitutional rights being violated, and single actions by final policymakers were violative of the Plaintiff's Constitutional rights. Among other policies at issue, SHP attempted to save money by intentionally failing to refer patients to outside hospitals even when it was obvious that the patient's condition required treatment at an outside hospital. SHP also attempted to save money by having nurses making clinical diagnoses of patients when clinical diagnoses should always be made by a physician and never by a nurse.

17. As a proximate result of the Defendants' acts and omissions, Valerie Magnan experienced conscious physical and emotional injury, and ultimately death.

## FIRST CAUSE OF ACTION
(U.S. Constitutional Violations - 42 U.S.C. § 1983)

18. Plaintiff incorporates all paragraphs above as if fully sated herein.

19. At all relevant times, Defendants were persons acting under color of state law, and are sued in the capacities set forth above for violating the Plaintiff's constitutional rights afforded to him by the Eight and Fourteenth Amendments to the United States Constitution.

20. At the time of the incidents at issue, the Plaintiff had clearly established rights under the United States Constitution.

a. To be free from any punishment;

b. To be free from government conduct that shocks the conscience;

c. To be free from cruel and unusual punishment;

d. To be free from deliberate indifference to a substantial risk of serious harm;

e. To be free from state created danger;

f. To bodily integrity; and

g. To adequate medical care and to be free from deliberate indifference to medical needs.

21. The Defendants violated these clearly established rights in the ways described in summary form herein, and in ways that will be uncovered in discovery and at trial.

22. The unconstitutional misconduct described herein was objectively unreasonable and was undertaken intentionally, with malice and knowing disregard for the Decedent's clearly established constitutional rights.

23. At all relevant times, SHP and its employees were performing essential state functions normally performed by SCSO. The complained of actions by SHP were carried out pursuant to the official policy of SHP, and/or were directly perpetrated by SHP final policymakers.

24. As a direct and proximate result of the above constitutional violations, the Plaintiff's decedent suffered serious physical and emotional injury, and ultimately death.

PUNITIVE DAMAGES

25. Plaintiff repeats and realledges each and every allegation set forth above with the same force and effect as if set forth fully herein.

26. The callous acts of the Defendants as described herein constitute malice or willful and wanton conduct.

27. The Defendants participated in or condoned the conduct constituting the aggravating factor giving rise to punitive damages in that their actions amount to reckless or callous indifference of the Decedent's rights guaranteed by the Constitution of the United States of America.

28. As a result of the acts and/or omissions described herein, the Plaintiff is entitled to a recovery of punitive damages to be determined by a jury.

WHEREFORE, Plaintiff prays for judgement against Defendants, for an award of actual, compensatory, special, general, economic, noneconomic, and punitive damages, as well as any other available damages, to be determined by a jury, that the costs of this action be taxed against the Defendants, together with attorney fees and costs for such other and further relief as the court deems just and proper.

Anderson, South Carolina
April 27, 2021

/s/ Kyle J. White
Kyle White (Fed. ID No. 11774)
White Davis and White Law Firm, PA
209 East Calhoun Street
Post Office Box 1346
Anderson, SC 29621
Telephone: (864) 231-8090
kyle@wdwlawfirm.com

Samuel R. Clawson, Jr. (Fed. ID No. 11850)
Christy Fargnoli (Fed. ID No. 10364)
Clawson Fargnoli Utsey, LLC
The Presquile House
2 Amherst Street
Charleston, SC 29403
(843) 970-2700
sam@cfulaw.com
christy@cfulaw.com

J. Thomas McElveen, III (Fed. ID No. 9883)
John R. Moorman (Fed. ID No. 10039)
Bryan Law Firm of SC, LLP
17 East Calhoun St.
Sumter, SC 29151
Telephone: (803) 775-1263
tmcelveen@bryanlaw.com
jmoorman@bryanlaw.com

Attorneys for the Plaintiff